# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| ENERGY FUTURE<br>HOLDINGS CORP., *et al.*, | Case No. 14-10979 (CSS) |
| *Debtors.* | (Jointly Administered) |
| ELLIOTT ASSOCIATES, L.P., *et al.*, | |
| *Plaintiffs*, | |
| v. | Adversary Proceeding<br>No. 17-50479 |
| ENERGY FUTURE INTERMEDIATE<br>HOLDING COMPANY LLC, *et al.*, | |
| *Defendants.* | |

## THE ELLIOTT FUNDS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION

BAYARD, P.A.
Scott D. Cousins (No. 3079)
Erin R. Fay (No. 5268)
Evan T. Miller (No. 5364)
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
E-mail:scousins@bayardlaw.com
    efay@bayardlaw.com
    emiller@bayardlaw.com

ROPES & GRAY LLP
Keith H. Wofford
Gregg M. Galardi
D. Ross Martin
Jonathan M. Agudelo
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: 212-596-9000
Facsimile:  212-596-9090
Keith.Wofford@ropesgray.com
Gregg.Galardi@ropesgray.com
Jonathan.Agudelo@ropesgray.com

*Counsel for Elliott Associates, L.P., Elliott
International, L.P., and the Liverpool Limited
Partnership*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................................. 1

STATEMENT OF PERTINENT FACTS ................................................................................... 3

THE REQUESTED INJUNCTION........................................................................................... 3

LEGAL STANDARD................................................................................................................. 3

ARGUMENT ............................................................................................................................. 5

I.    THERE IS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS......... 5

   A.    As a Matter of Contract Interpretation, Elliott Is Not Bound to the PIK PSA .............. 6

      1.    The PIK PSA Contemplates Binding Only Creditors With Respect to PIK
Notes, Excluding Other Claims, and Elliott Owns First Lien Notes and
Second Lien Notes .................................................................................................... 6

      2.    Interpreting the PIK PSA More Broadly, to Restrict Rights to File a Plan,
Would Require this Court to Decide Whether a Post-Petition Contract Can
Override the Fundamental Chapter 11 Principle that Exclusivity Ends After
20 Months .................................................................................................................. 8

   B.    Elliott Is Likely to Succeed In Its Contention that the Voidness Provision Is Not
Directly Enforceable Against Elliott ............................................................................ 10

      1.    The PIK PSA Contemplates Binding Only "Supporting Creditors," and Elliott
Is Not a Supporting Creditor.................................................................................... 10

      2.    The Voidness Provision Is Not Enforceable Against Elliott Under an Outside-
the-Contract Theory ................................................................................................ 11

   C.    Elliott Acquired Its Securities Entitlements to PIK Notes Free of any Restrictions of
the PIK PSA, by Operation of UCC Article 8............................................................. 15

II.   There is a Threat of Imminent Irreparable Harm to Elliott in the Absence of an Injunction
...................................................................................................................................... 19

III.  THE BALANCE OF HARDSHIPS FAVORS ELLIOTT BECAUSE THERE Is NO
HARM TO THE DEBTORS FROM ELLIOTT SPEAKING WITH OTHER
CREDITORS, PROPOSING MONEY-SAVING FINANCING TRANSACTIONS, OR
COMMENCING A PLAN PROCESS ........................................................................... 20

IV.  THE GRANTING OF THE PRELIMINARY INJUNCTION IS NOT CONTRARY TO
THE PUBLIC INTEREST.............................................................................................. 22

V.    ONLY A NOMINAL BOND IS APPROPRIATE, AND THE DEBTORS WAIVED
ANY BOND REQUIREMENT ...................................................................................... 22

   A.    If a Bond Is Required, It Should be Nominal Because the Debtors Cannot Demonstrate
Potential Harm from the Proposed Injunction............................................................. 23

   B.    No Bond Is Required Because in the PIK PSA the Debtors Waived any Bonding
Requirement ................................................................................................................. 24

CONCLUSION........................................................................................................................ 26

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Advanced Mktg. Servs., Inc.*,
  360 B.R. 421 (Bankr. D. Del. 2007) ....................................................................24

*Am. Freedom Def. Initiative v. Se. Pennsylvania Transp. Auth.*,
  92 F. Supp. 3d 314 (E.D. Pa. 2015) ....................................................................26

*Am. Legacy Found. v. Lorillard Tobacco Co.*,
  831 A.2d 335 (Del. Ch. 2003)..............................................................................15

*In re Broadstripe, LLC*,
  402 B.R. 646 (Bankr. D. Del. 2009) ................................................................9, 10

*Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*,
  847 F.2d 100 (3d Cir.1988)..................................................................................26

*In re Grossman's, Inc.*,
  No. 97-695 (PJW), 1997 WL 33446314 (Bankr. D. Del. Oct. 9, 1997) ...............18

*Hoxworth v. Blinder, Robinson & Co.*,
  903 F.2d 186 (3d Cir. 1990).................................................................................26

*Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*,
  562 F.3d 553 (3d Cir. 2009).................................................................................22

*MBIA Ins. Corp. v. Royal Indemnity Co.*,
  294 F. Supp. 2d 606 (D. Del. 2003) .....................................................................16

*In re Millennium Lab Holdings II, LLC*,
  --- F. Supp. 3d ---, 2017 WL 1032992 (D. Del. Mar. 17, 2017).......................17, 18

*Neo Gen Screening, Inc. v. TeleChem Int'l, Inc.*,
  69 F. App'x 550 (3d Cir. 2003) ............................................................................26

*Opticians Ass'n of Am. v. Indep. Opticians of Am.*,
  920 F.2d 187 (3d Cir. 1990)...................................................................................9

*In re Phar-Mor, Inc.*,
  152 B.R. 924 (Bankr. N.D. Ohio 1993) ................................................................18

*In re Prudential Lines, Inc.*,
  107 B.R. 832 (Bankr. S.D.N.Y. 1989), *aff'd*, 119 B.R. 430 (S.D.N.Y. 1990),
  *aff'd*, 928 F.2d 565 (2d Cir. 1991) .......................................................................18

*In re Revel AC, Inc.*,
   802 F.3d 558 (3d Cir. 2015)....................................................................................10, 11, 26

*Singer Mgmt. Consultants, Inc. v. Milgram*,
   650 F.3d 223 (3d Cir. 2011)................................................................................................11

*State of California Pub. Employees' Ret. Sys. v. Shearman & Sterling*,
   741 N.E.2d 101 (2000).......................................................................................................16

*Stern. Corliss Moore & Assocs., LLC v. Credit Control Servs.*,
   497 B.R. 219 (E.D. Va. 2013) . A Confirmation Order.......................................................17

*Stern v. Marshall*,
   564 U.S. 462 (2011)............................................................................................................17

*In re Swift Energy Co.*,
   No. 15-12670 (MFW), 2016 WL 3566962 (D. Del. June 29, 2016) ......................................9

*In re Tribune Media Co.*,
   799 F.3d 272 (3d Cir. 2015)................................................................................................27

*In re W.R. Grace & Co.*,
   475 B.R. 34 (D. Del. 2002)..................................................................................................27

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)..................................................................................................................9

**Statutes**

Bankruptcy Code Chapter 11 ..................................................................................... *passim*

Bankruptcy Code Section 362 .........................................................................................18

UCC 1-204 .......................................................................................................................20

UCC 8 .........................................................................................................................19, 20

UCC 8-102(9), (17)...........................................................................................................20

UCC 8-105 ........................................................................................................................20, 21

UCC 8-105(a)(1), (2) & cmts. 3, 4....................................................................................21

UCC 8-105 cmt.2 ..............................................................................................................21

UCC 8-501 ........................................................................................................................20

UCC 8-502 ....................................................................................................................20, 22

iii

UCC 8-502 cmt.1 ..........................................................................................................................20

**Other Authorities**

Bankruptcy Rule 7065 .................................................................................................................26

Fed. R. Civ. P. 65(c) ...................................................................................................................26

iv

Elliott Associates, L.P., Elliott International, L.P. and The Liverpool Limited Partnership (collectively, "Elliott" or the "Elliott Funds"), as plaintiffs in the above-captioned adversary proceeding (the "Action") and as beneficial owners of PIK Notes, First Lien Notes, and Second Lien Notes (each as defined herein) of EFIH, respectfully submit this memorandum of law in support of the Motion for Preliminary Injunction (the "Preliminary Injunction Motion" or the "Motion"), filed concurrently herewith.  Through the Motion, Elliott seeks a preliminary injunction enjoining the Debtors from (i) taking any actions interfering with Elliott discussing, negotiating or proposing with any person a DIP financing facility; (ii) interfering with Elliott discussing, negotiating and/or proposing with any person an alternative plan or transaction, subject to the rights of any party in interest to oppose any transactions or plan proposed by Elliott; and (iii) threatening any creditor or party in interest regarding discussions, negotiations and agreements with Elliott concerning such DIP financing, plan and/or alternative transaction, or imposing any liability on such persons, based on any non-disclosure or similar agreement, plan support agreement or other restrictive provision.  In support of the Motion, Elliott respectfully represents as follows:

## PRELIMINARY STATEMENT

1.    Elliott is the beneficial owner of approximately: (i) $782 million face amount of First Lien Notes,[1] (ii) $921 million face amount of Second Lien Notes[2] and (iii) $1.162 billion of PIK Notes.[3]  Elliott purchased its claims during the course of these bankruptcy cases and became the majority holder of the PIK Notes in April 2017.

---

[1] The "First Lien Notes" are the "EFIH First Lien Notes," as the latter term is defined in the Eighth Plan.
[2] The "Second Lien Notes" are the "EFIH Second Lien Notes," as the latter term is defined in the Eighth Plan.
[3] The "PIK Notes" are the "EFIH Unsecured Notes," as the latter term is defined in the Eighth Plan.

2.      The Debtors' Chapter 11 cases are at another crossroads.  As the Court is well aware, the Debtors' confirmed Eighth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code [D.I. 10853] (the "Eighth Plan") was premised on consummating the restructuring transactions that are set forth in the Merger Agreement with NextEra Energy, Inc. ("NextEra").  At this time, the Debtors are not able to consummate the Eighth Plan.  By order dated April 13, 2017 (the "PUCT Final Order"), the Public Utility Commission of Texas ("PUCT") denied NextEra's and Oncor Electric Delivery Company LLC's ("Oncor") application for NextEra to acquire (via merger with EFH) the 80% ownership stake that EFH indirectly holds in Oncor, the primary electricity transmission company in Texas (the "NextEra Merger Transaction").  As a result, a condition precedent to the consummation of the Eighth Plan presently cannot be satisfied and so the Eighth Plan cannot go effective.

3.      On May 8, 2017, NextEra filed a motion for rehearing (without its co-applicant Oncor) seeking to reverse the PUCT Final Order (the "Rehearing Request").  An open meeting with respect to that rehearing Request is scheduled for May 18, 2017 at 9:30 a.m.

4.      Elliott seeks a preliminary injunction with the goal of being able to exercise its rights to move these cases forward with third parties and the Debtors on an alternative plan and a global DIP financing facility, and to file its own plan.  The Debtors' unwillingness to support Elliott's efforts on this front are either (i) a thinly veiled attempt to maintain exclusivity long after their statutory rights have lapsed or (ii) a fear that Elliott will propose a plan of reorganization that might not be supported by EFH.  Neither of these reasons, however, constitutes a basis to deny Elliott's request because as a creditor Elliott is permitted to do any or all of these things and the Debtors will have an opportunity to respond in this Court.

Accordingly, as demonstrated below, Elliott respectfully submits that it meets the standards necessary for the Court to issue a preliminary injunction.

## STATEMENT OF PERTINENT FACTS

5.      For brevity, Elliott incorporates by reference its Verified Complaint filed in this adversary proceeding.[4]

## THE REQUESTED INJUNCTION

Elliott requests a preliminary injunction as follows:

1.      Enjoining the Debtors from taking any actions interfering with Elliott discussing, negotiating or proposing with any person a DIP financing facility, including convertible DIP financing, subject to the Debtors' rights (a) to accept or reject any proposed DIP financing and (b) to oppose any such transactions in this Court;

2.      Enjoining the Debtors from interfering with Elliott discussing, negotiating and proposing with any person an alternative plan or transaction, subject to the Debtors' rights to oppose any such plan or transaction in this Court; and

3.      Enjoining the Debtors from threatening any creditor, party in interest or other person regarding discussions, negotiations and agreements with Elliott concerning such DIP financing, plan or alternative transaction, or imposing any liability on such persons, based on any non-disclosure or similar agreement, plan support agreement or other restrictive provision.

## LEGAL STANDARD

6.      To obtain a preliminary injunction, the movant must demonstrate each of four factors: (1) substantial likelihood of success on the merits; (2) irreparable injury in the absence of an injunction; (3) that the threatened injury to the movant outweighs the damage an injunction would cause to the opposing party; and (4) the injunction would not be adverse to the public interest.  *E.g., Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990).

---

[4] Capitalized terms not defined herein shall have the meanings ascribed to them in the Verified Complaint.

62659981_8

7.    "[T]he court must engage in a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury.  Such a 'delicate balancing' requires that the [preliminary injunction] factors be weighed, rather than mechanically applied."  *In re Broadstripe, LLC*, 402 B.R. 646, 655 (Bankr. D. Del. 2009) (internal quotation marks and citations omitted)).  When considering the factors in a preliminary injunction motion, the court need not give each factor equal weight because "the analysis is flexible."  *See In re Swift Energy Co.*, No. 15-12670 (MFW), 2016 WL 3566962, at *4 (D. Del. June 29, 2016) (citing *In re Tribune*, 477 B.R. 465, 475 (Bankr. D. Del. 2012)).

8.    In the context of a stay pending appeal of bankruptcy orders, which uses this same analysis, the Third Circuit recently explained that "all four stay factors are interconnected, and thus the analysis should proceed as follows.  Did the applicant make a sufficient showing that (a) it can win on the merits (significantly better than negligible but not greater than 50%) *and* (b) will suffer irreparable harm absent a stay?"  *In re Revel AC, Inc.*, 802 F.3d 558, 571 (3d Cir. 2015) (emphasis in original).  If the movant makes that showing, the courts will "balance the relative harms considering all four factors using a 'sliding scale' approach."  *Id.*  "[D]epending on how strong a case the stay movant has on the merits, a stay is permissible even if the balance of harms and public interest weigh against holding a ruling in abeyance pending appeal."  *Id.*

9.    Any mechanical approach is impractical and has the potential to be deeply unfair.  *Id.* at 570.  When considerable injury will result from either the grant or denial of a preliminary injunction, the other factors to some extent cancel each other and greater significant must be place upon the likelihood that each party will ultimately succeed on the merits of the litigation.  *See, e.g., id*. at 570, 575 ("[W]hile the public interest appears to favor a stay denial, that alone

4

doesn't tip the four-factor balance in [the preliminary injunction opponent's] favor."). As demonstrated below, Elliott satisfies each factor, and a balancing of them.

<b><u>ARGUMENT</u></b>

10.    Elliott's request for a preliminary injunction arises from Counts I-III of the Complaint. Those three counts address the Debtors' threats that Elliott is exposed to liability based on, and the alleged effects on Elliott of, the January 2017 Plan Support Agreement (the "<u>PIK PSA</u>").[5] On this Motion, it is likelihood of success on those three counts that is at stake.[6] The likelihood of success is determined for each separate count seeking declaratory relief. *See Broadstripe,* 402 B.R. at 655–58.

## I.    THERE IS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

11.    Substantial likelihood of success means a "reasonable chance, or probability, of winning" at trial. *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011). A "likelihood" does not mean "more likely than not," *id.*, but rather "significantly better than negligible but not greater than 50%," *Revel*, 802 F.3d at 571. In any event, Elliott has a very high chance of succeeding on the merits for each of the reasons set forth in Counts I-III of the Complaint. Those counts set forth why the PIK PSA does not bind any actions of Elliott, based on a simple contractual interpretation of the PIK PSA (Count I), the Debtors' apparent position

---

[5] That certain Plan Support Agreement is dated as of January 2, 2017 (the "<u>Original PIK PSA</u>"), was amended by that Amendment to the Plan Support Agreement dated as of January 19, 2017 (the "<u>Amended PIK PSA,</u>"), and was by and among (a) the Debtors, (b) UMB Bank, N.A., as the indenture trustee for the EFIH Unsecured Notes (the "<u>PIK Notes Trustee</u>", and (c) certain holders of PIK Notes who at the time beneficially owned approximately 66 2/3% of the PIK Notes. A true and correct copy of the Original PIK PSA is attached as <u>Exhibit A</u> to the <u>Declaration of Erin R. Fay Filed in Connection with the (I) Verified Complaint for Declaratory and Injunctive Relief and (II) The Elliott Funds' Motion for Preliminary Injunction</u> (the "<u>Declaration</u>"), filed contemporaneously herewith. References to the Exhibits in this Complaint refer to the Exhibits contained in the Declaration. A true and correct copy of the Amended PIK PSA is attached as <u>Exhibit B</u>. The term "PIK PSA" will be used when there is no material difference between the Original PIK PSA and the Amended PIK PSA.

[6] Elliott does not seek preliminary relief based on Count IV, which addresses whether the Eighth Plan ultimately cannot be consummated, the pending PUCT rehearing process, and technical provisions of the existing Confirmation Order. The existing Confirmation Order does and should remain fully in place at this time, in the event that PUCT approval is obtained. In Count IV of the Complaint, Elliott seeks only final relief for a determination that this Court would make only after Elliott files a plan.

5

(if correct) regarding the Voidness Provision (Count II), and the Uniform Commercial Code (Count III).

**A.    As a Matter of Contract Interpretation, Elliott Is Not Bound to the PIK PSA**

      1.    The PIK PSA Contemplates Binding Only Creditors With Respect to PIK Notes, Excluding Other Claims, and Elliott Owns First Lien Notes and Second Lien Notes

12.    The PIK PSA itself expressly does not bind Elliott with respect to First Lien Notes and Second Lien Notes, each of which Elliott owns in substantial quantities. The Original and Amended PIK PSA explicitly state, in their very first operative provision (the "PIK-Notes-Only Provision"), that those agreements bind a creditor only with respect to PIK Notes:

> Each Supporting Creditor . . . shall be bound by and subject to the provisions [of the Amended PIK PSA] only as a holder or trustee of [PIK Notes], in respect of which it is signing this [Amended PIK PSA] . . . and any reference to Claims with respect to an obligation of a Supporting Creditor only refers, respectively, to its [PIK Notes] whether or not it uses those terms.

Amended PIK PSA at 1. Even if Elliott is bound to the PIK PSA, that agreement simply does not apply to restrict Elliott—by its own terms. *E.g., In re Ryckman Creek Resources, LLC,* 2017 WL 548185, No. 16-10292, at *11 (Bankr. D. Del. Feb. 8, 2017) (unambiguous terms construed by plain meaning); *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund,* 68 A.3d 665, 683 (Del. 2013); *BLGH Holdings LLC v. enXco LFG Holding, LLC*, 41 A.3d 410, 414 (Del. 2012). The PIK PSA covers creditors "only as a holder or trustee of the [PIK Notes]."

13.    The covenants of the Supporting Creditors are also expressly limited to the PIK Notes. The commitments of each "Supporting PIK Party" are that "each Supporting Creditor (in its capacity as a Holder of [PIK Notes] Claim . . . agrees" to take various actions and refrain from others. PIK PSA 4.01(a).

6

14.     The transfer provisions of the PIK PSA make this equally clear.  All of Section 4.04(a) applies to "a Supporting Creditor (solely in its capacity as holder [a PIK Note] Claim)." Further, Section 4.04(b) provides (emphasis added):

> [T]his Agreement shall in no way be construed to preclude the Supporting Creditors from acquiring additional Claims; provided, however, that **if a Supporting Creditor acquires [PIK Note] Claims** after the date hereof, (i) such Supporting Creditor, as applicable, shall promptly notify the EFH/EFIH Debtors, as applicable, at the contact information on the Transfer Agreement of such acquisition, including the amount of such acquisition, and (ii) **such additional Claims** shall automatically and immediately upon acquisition by such Supporting Creditor, as applicable, be deemed to be subject to the terms and conditions of this Agreement (regardless of when or whether notice of such acquisition is given to the EFH/EFIH Debtors).

15.     Even if one looked outside the four corners of the PIK PSA, these provisions are in direct contrast to the manner in which the Debtors drafted other plan support agreements in these cases, all of which purport to bind the relevant noteholders in respect of all of their note positions.  For example, the equivalent provision to Section 4.04(b) in those other agreements all bind all pre-petition claims.  *See* Fidelity PSA § 4.05(b) ("such additional Claims [as defined in the Plan] shall be automatically and immediately upon acquisition . . . be deemed to be subject to the terms and conditions of this Agreement"); TCEH PSA § 7(c) ("such acquired Supporting Claims/Interests [defined to include "Debtor Claims/Interests," which are "a class of claims or interests against or in the Debtors"] shall automatically and immediately upon acquisition  . . . be deemed subject to the terms of this Agreement).  The other plan support agreements have no equivalent of the PIK-Notes-Only Provision at the outset of the agreement.  The Debtors knew how to draft provisions that would bind all claims, and did not do so.  As a straightforward matter of contract interpretation of the PIK PSA, Elliott has the independent right in its role as

holder of First Lien Notes and Second Lien Notes to discuss and pursue any plan, DIP financing, or take other action in these cases.

16.     Elliott is highly likely to succeed on this argument, based on plain text and even the most telling extrinsic evidence further confirms the contract interpretation. This contractual interpretation argument alone satisfies the substantial likelihood of success necessary for Elliott to obtain a preliminary injunction.

2.     Interpreting the PIK PSA More Broadly, to Restrict Rights to File a Plan, Would Require this Court to Decide Whether a Post-Petition Contract Can Override the Fundamental Chapter 11 Principle that Exclusivity Ends After 20 Months

17.     There is another reason for this Court to adopt the simple, plain reading of the PIK PSA. To take any broader interpretation of the PIK PSA—limiting Elliott's rights to file a plan—would raise serious questions about whether that agreement to affect exclusivity is enforceable at all. Exclusivity expired in these Chapter 11 cases over 16 months ago. One of the most fundamental rules in Chapter 11 is that the debtor begins the case with exclusivity, but that exclusivity expires after 20 months under all circumstances. 11 U.S.C. § 1121(d)(2)(B). This was a critical change that Congress enacted in 2005, precisely to affect the fundamental bargaining dynamic in Chapter 11 cases.

18.     The Supreme Court held just this Term that a debtor cannot enter into a contract to arrange for an adjustment of debtor-creditor relations that is different from the fundamental rules that govern the Chapter 11 process. *Czyzewski v. Jevic Holding Corp*, 137 S.Ct. 973 (2017) (no structured dismissals by agreement). *See also In re Armstrong World Indus., Inc.*, 432 F.3d 507 (3d Cir. 2005) (no gifting plans by agreement). Indeed, not even bankruptcy court approval would permit such a contract, because even testing for "sufficient reasons" to approve such a contract "threatens to turn 'a rare case' into a more general rule." *Jevic*, 137 S. Ct. at 986. The

8

Supreme Court noted that the fundamental rules of bargaining among debtors and creditors are at the core of what the bankruptcy courts must preserve, and that debtors cannot be allowed to evade by contract. *Id.* at 986-87. Those fundamental principles identified in *Jevic* include the fact that there are only three ways out of Chapter 11: a consummated plan of reorganization, dismissal or conversion. *Id.* at 973. No other path is permitted, for risk to the Chapter 11 process. "Departure[s] from the protections that Congress has granted" make for "consequences that are potentially serious." *Id.* at 986. "They include changes in the bargaining power of different classes of creditors," "risks of collusion," and "making settlement more difficult to achieve." *Id.* at 987. Hand-in-hand with the most common of those three paths (the Chapter 11 plan) is that the debtor gets exclusivity, but only with a definitive expiration date, so ultimately creditors have their chance. The Debtors cannot, certainly in agreements not publicly disclosed, and even with court approval (which was not obtained here), "alter the balance struck by the statute." *Id.* (quoting *Law v. Siegel*, 134 S.Ct. 1188, 1198 (2014)).

19.    If the Debtors here take the position that the PIK PSA eliminates the ability of creditors to file their own plans (indeed even without court approval of the PIK PSA), this danger is at the door. Such an interpretation would squarely raise the issue of a debtor in possession's authority and power after the expiration of the exclusive period. The PIK PSA is not a contract signed prepetition that facilitates the debtors' exclusive period. The PIK PSA is not a post-petition plan support agreement that addresses activities during the exclusive period, or even an agreement to allow the maximum length of exclusivity. This is a post-exclusivity contract designed (if Elliott is precluded from filing a plan) to maintain exclusivity for the Debtors during the time that the statute expressly forbids debtor exclusivity.

20.     A debtor in possession has innumerable powers and massive influence in a Chapter 11 case, both before and after exclusivity expires.  It controls information about the company.  The management team often is a key player in the business negotiations with any new counterparty for whatever transaction could lead the company out of bankruptcy.  Creditors by necessity must go along with many debtor decisions, small and large.  But if debtors can use that power and influence to demand that creditors give up fundamental rights, the exact harm to the bargaining process would occur that *Jevic* and *Armstrong* work to prevent.

21.     Fortunately in this case the PIK PSA, on its plain text interpretation, does not raise this issue if Elliott can file a plan because it owns claims other than PIK Notes.  If the Debtors take the position that Elliott is not entirely free to act, then this Court will have to confront the question of whether a debtor can make a contract that effectively eliminates the right of creditors to file a plan after exclusivity expires.  Elliott has expressly asked the Debtors whether it can act based on its First Lien and Second Lien Notes.  Complaint ¶ 64.  The Debtors have responded with threats that the PSA would be in force.  Complaint ¶¶ 61, 64-66.  The issue is ripe.  It can be resolved on contractual interpretation grounds, on other issues of scope of the debtor in possession's power, or on the variety of issues described below.

**B.      Elliott Is Likely to Succeed In Its Contention that the Voidness Provision Is Not Directly Enforceable Against Elliott**

1.      The PIK PSA Contemplates Binding Only "Supporting Creditors," and Elliott Is Not a Supporting Creditor

22.     It is axiomatic that "a fundamental principal of contract law provides that only parties to a contract are bound by that contract." *E.g., Am. Legacy Found. v. Lorillard Tobacco Co.*, 831 A.2d 335, 343 (Del. Ch. 2003) (citing *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) ("It goes without saying that a contract cannot bind a nonparty.")).  The noteholder parties to the PIK PSA are referred to therein as "Supporting Creditors."  Elliott was not a

10

signatory to either the Original PIK PSA or the Amended PIK PSA.  The PIK PSA contemplates that new parties may join, as transferees execute and deliver Transfer Agreements in accordance with the terms of section 4.04 of the PIK PSA.  *See* Form of Transfer Agreement (PIK PSA Ex. A) ("The [Transferee] . . . agrees . . . *to be* bound by the terms and conditions [of the PIK PSA], and *shall be* deemed a 'Supporting Creditor' as applicable, under the terms of the [PIK PSA] . . . .") (emphasis added).  Elliott has not signed any Transfer Agreements, and therefore it is simply not party to the PIK PSA, both as contemplated by that agreement's own terms and as a matter of fundamental contract law.  Complaint ¶¶ 25, 30.

23.    The PIK PSA provides that there are no third party beneficiaries, and except as otherwise provided in the PIK PSA, the rights and obligations may not be assigned, delegated, or transferred to any other person or entity.  *See* PIK PSA § 10.09.  Nor can the Debtors intervene themselves as third party beneficiaries regarding the terms of the trade between Elliott and its seller, as those parties did not enter into those trades with the intent of benefiting the Debtors.  *See MBIA Ins. Corp. v. Royal Indemnity Co.*, 294 F. Supp. 2d 606, 611-12 (D. Del. 2003) (to qualify as a third party beneficiary of a contract under Delaware law, a party must demonstrate, among other things, that the contracting parties must have intended that the third party beneficiary benefit from the contract); *State of California Pub. Employees' Ret. Sys. v. Shearman & Sterling*, 741 N.E.2d 101, 104 (2000) (under New York law, contract must have been intended for third party's benefit).

2.    The Voidness Provision Is Not Enforceable Against Elliott Under an Outside-the-Contract Theory

24.    While in one breath the Debtors have contended that Elliott's PIK Notes are subject to the PIK PSA, in the next breath the Debtors have contended that the PIK Notes that Elliott owns that were previously owned by Supporting Creditors are void *ab initio* because

11

Elliott has not executed the Transfer Agreement. Complaint ¶ 84. This threat that somehow Elliott's substantial purchases of PIK Notes are void must emanate from something outside the contract (because there is no privity). But if it is some non-contractual right, it ignores principles of fundamental judicial authority, and also the limits of bankruptcy court authority over non-debtor parties.

25.     This threat apparently emanates from PIK PSA § 4.04(e), which purports to provide that, "Any transfer made in violation of Section 4.04 shall be void *ab initio*." While Elliott does not think that the Voidness Provision is operative, there is an irony if the Debtors take the position that the trades are void. If Elliott's purchases of PIK PSA Notes are void, then the only securities that Elliott owns are not locked-up by any plan support agreement. Thus there would not be any conceivable legal barrier to Elliott proposing a plan or DIP financing, or discussing any matter, as a holder of First Lien Notes and Second Lien Notes and any other claim not subject to the PIK PSA. The Debtors are trying to have it both ways, with a threat that Elliott's trades are void, but also a threat of damages or other remedy based on Elliott supposedly harming the Debtors with respect to those very same securities.

26.     The Voidness Provision is not enforceable against Elliott for two reasons. First, any court, including this Court, would lack the authority to retroactively void a transaction between Elliott and its seller, neither of whom was actually a party to the PIK PSA. The PIK PSA has never been court approved prior to the transaction. This is not a case of rescission of a transaction between the Debtors and Elliott. This would involve a court somehow retroactively voiding and/or rescinding contracts between third-parties (Elliott and its sellers) based on a contract between two other parties (the Debtors and the original Supporting Creditors).

27.     Second, whether prior to the Elliott PIK Note trades, or now, this Court could not have entered a final order that has the effect that the Voidness Provision purports to have on non-debtor parties.  Perhaps the Debtors will attempt to say that the confirmation order or some other document gave court approval to the PIK PSA, and prospectively barred the Elliott purchases of PIK Notes.  But even a bankruptcy court's confirmation order cannot affect third party rights prospectively in this way.  Following *Stern v. Marshall*, 564 U.S. 462 (2011), the Court must also have the constitutional authority to enter a final order, even if the matter is "core."  *Id.* at *4. An order affecting third parties, in the way the Voidness Provision purports, is either "*Stern*-governed" or non-core.  Only an Article III court can affect nonbankruptcy rights of third parties in that way.  *In re Millennium Lab Holdings II, LLC*, --- F. Supp. 3d ---, 2017 WL 1032992, at *2 (D. Del. Mar. 17, 2017).  Furthermore, post-*Stern* case law holds that even direct causes of action regarding post-petition contracts are subject to *Stern*.  *See Corliss Moore & Assocs., LLC v. Credit Control Servs.*, 497 B.R. 219 (E.D. Va. 2013) (discussing a pre-*Stern* circuit split regarding post-petition contracts).  A Confirmation Order (such as the order approving the Eighth Plan) is not a jurisdictional and adjudicatory "blank check" that would transform a non-core matter into a core matter over which this Court could have entered a final order approving the Voidness Provision as to third parties.  *Millennium Lab Holdings*, 2017 WL 1032992, at *3, 13.

28.     As in *Millennium Lab Holdings*, the bankruptcy court (this Court) should first rule on whether a prior order (whatever order the Debtors might assert approved the Voidness Provision, if any) was properly within the bankruptcy court's constitutional authority.  *Id.* at *14. There are situations in which bankruptcy courts have entered final orders enjoining third-party trading in securities, but those situations are not applicable here.  Those cases involve preserving

13

property of the estate.  For example, bankruptcy courts have issued orders that restrict prospective trading of a debtor's securities in order to protect a debtor's net operating losses ("NOLs") and other tax attributes, on the basis that these attributes are property of the estate. *E.g.*, *In re Prudential Lines, Inc.*, 107 B.R. 832, 838 (Bankr. S.D.N.Y. 1989), *aff'd*, 119 B.R. 430 (S.D.N.Y. 1990), *aff'd*, 928 F.2d 565 (2d Cir. 1991).  The statutory basis for issuing such orders is grounded on the enforcement of the automatic stay under Bankruptcy Code section 362.  *See In re Grossman's, Inc.*, No. 97-695 (PJW), 1997 WL 33446314, at *1 (Bankr. D. Del. Oct. 9, 1997) (NOLs were property of debtors' estates and protected by automatic stay); *In re Phar-Mor, Inc.*, 152 B.R. 924, 927 (Bankr. N.D. Ohio 1993) (Bankruptcy Code section 362 prohibited sale of stock in the debtors as an exercise of control of debtors' NOLs).  Importantly, courts enter final trading-restriction orders following notice and a hearing with respect to future trading of securities.  Sometimes that occurs on an interim basis at a first-day hearing, with appropriate evidence.

29.    The Voidness Provision differs in every respect.  To the extent that the Debtors wanted to enforce the provision, they should have sought approval before Supporting Creditors transferred PIK Notes.  There is also no order that contains factual findings or rulings of law regarding the Voidness Provision raising issues of necessary specificity and notice.  A transfer of PIK Notes does not implicate property of the estate to preserve tax attributes.[7]

30.    In summary, Elliott asserts that its purchases of PIK Notes are valid.  In that circumstance, Elliott is entitled to take actions (a) as a First Lien and Second Lien Noteholder for

---

[7] On information and belief the Debtors have known that numerous sales of Supporting Creditor PIK Notes have occurred with respect to which neither the Debtors, Supporting Creditors nor the marketmakers obtained Transfer Agreements. The Debtors and the Supporting Creditors knowingly and willingly entered into the Amended PIK PSA that: (i) contemplated that Transfer Agreements might not be obtained from purchasers of PIK Notes; (ii) permitted marketmakers to sell PIK Notes without advising a purchaser knowing whether or not those PIK Notes were Supporting Creditor PIK Notes; and (iii) did not seek Bankruptcy Court approval of the Voidness Provision that the Debtors would request the Bankruptcy Court to employ in the event that Supporting Creditor PIK Notes were traded without a Transfer Agreement.

the reasons described in Part I.A above (secured notes are not bound by the PIK PSA) and (b) as a PIK Noteholder for the reasons described in Part I.C below (Elliott purchased PIK Notes free and clear of the PIK PSA under UCC Article 8). But if this Court concludes that the Voidness Provision is enforceable against Elliott, then it is beyond question that Elliott can take any actions, because it would own no PIK Notes subject to the various covenants regarding the transfer of PIK Notes held by Supporting Creditors, and all of its other holdings still make it the largest single prepetition creditor in these cases. That more than meets the "substantial likelihood of success" standard necessary for a preliminary injunction.

C.  **Elliott Acquired Its Securities Entitlements to PIK Notes Free of any Restrictions of the PIK PSA, by Operation of UCC Article 8**

31. Elliott acquired and owns its PIK Notes in "street name," indirectly through custodians and intermediaries. In other words, what Elliott holds are securities entitlements under Article 8 of the Uniform Commercial Code, not actual PIK Notes. This is a typical method for holding securities in U.S. markets, and should be of no surprise to the Debtors or any other party in interest. All of the debt instruments issued by EFIH were, from the outset, issued in book-entry form. The representations and warranties that the Debtors obtained from Supporting Creditors who signed the PIK PSA were that the Supporting Creditors were "beneficial owners" of PIK Notes, holders of securities entitlements.

32. Elliott's rights are therefore defined by Article 8 of the UCC, which in relevant part is the same in New York, Delaware and Texas. Specifically, UCC 8-502 gives the purchaser of a securities entitlement, in these circumstances, protections that are equivalent of a "holder in due course" of a negotiable instrument and a "protected purchaser" of a directly held security. Article 8-105 of the Uniform Commercial Code, as applicable under New York,

15

Delaware and Texas law (the "UCC") bars the Debtors' claim against Elliott in respect of Elliott's acquisition of PIK Notes.  In particular, Article 8-502 provides that:

> An action based on an adverse claim to a financial asset, whether framed in conversion, replevin, constructive trust, equitable lien, or other theory, may not be asserted against a person who acquires a security interest under Section 8-501 for value and without notice of the adverse claim.

A "financial asset" includes a securities entitlement, UCC 8-102(9), (17), which is what Elliott has purchased.  Elliott is such a purchaser.  Elliott paid for all of its PIK Notes, and thus provided "value."  UCC 1-204.

33.    The Official Comments to UCC 8-502 make clear that unless a purchaser has "notice of an adverse claim," "once a person has acquired [a security entitlement], someone else cannot take it away on the basis of assertion that the transaction in which the security entitlement was created involved a violation of the claimant's rights."  UCC 8-502 cmt.1.  That is, a purchaser of a securities entitlement, for value and without notice of an adverse claim, is not subject to outside third-party claims.  *See id.*

34.    An "adverse claim" is a claim that a claimant has a property interest in a financial asset and that it is a violation of the rights of the claimant for another person to hold, transfer, or deal with the financial asset.  UCC 8-102(a)(1).  In the first instance, the mere contractual restrictions of the PIK PSA do not rise to the level of "adverse claims," which include only true *in rem* property interests such as liens.  *Id.* cmt. 1; *see Chase Inv. Servs. Corp. v. Law Offices of Jon Divens & Assocs., LLC*, 748 F.Supp.2d 1145, 1174 (D. C.D.Cal. 2010) (stating that the UCC official comments clarify that "the definition of an 'adverse claim' is limited to property interests (including ownership interest) and does not extend to any and all wrongful actions concerning securities"); *Meadow Homes Devel. Corp. v. Bowens*, 211 P.3d 743, 747 (Colo. App. 2009) (noting that a breach of contract by itself does not establish a property interest).  For example,

16

the Voidness Provision does not purport to give the Debtors any right of ownership in the PIK Notes, but rather only purports to void rights of third parties in certain circumstances.

35.    Second, even if the Voidness Provision or some other PIK PSA rights constituted a property interest and therefore an "adverse claim," Elliott did not have "notice" that meets the requirements of UCC 8-105.  Notice under UCC 8-105 is a narrow concept and requires (i) actual knowledge or (ii) willful blindness.  UCC 8-105(a)(1), (2) & cmts. 3, 4.  Elliott did not have, and could not possibly have had, actual knowledge that the Original PIK PSA imposed some blanket, for-all-time restriction.  The entire Original PIK PSA, and all of its restrictions, were terminable at the sole discretion of 50.1% of Supporting Creditors (by amount), if court approval of the Original PIK PSA was not obtained by February 5, 2017.  *See* Original PIK PSA 8.01(i).  That court approval did not occur; indeed the Debtors never even sought court approval. Complaint ¶ 27.

36.    The PIK PSA became, arguably (according to the Debtors), a for-all-time restriction on subsequent purchasers only by virtue of the Amended PIK PSA that removed the court approval concept and the right of Supporting Noteholders to terminate for lack of court approval.  *Id.*  That Amendment was undisclosed and never publicly filed.  *Id.*  Therefore Elliott cannot be charged with the actual knowledge that UCC 8-105 requires.

37.    It also cannot be charged with willful blindness, because the Amendment was not placed on the docket, and the briefest technical mention in a plan redline the day before a consensual confirmation hearing is not any meaningful notice.  UCC 8-105(e) states that the filing of a financing statement does not give notice, and similarly it cannot be that the mere mention of the Amendment in passing could be adequate notice of an adverse claim.  That

17

limited and circumscribed restriction of the Original PIK PSA is the only restriction to which Elliott could possibly be subject.

38.     Furthermore, even if the Amended PIK PSA rose to the level of a "property interest" (which it cannot) and even if Elliott had actual knowledge (which it did not), Elliott would still have acquired its securities entitlements in the PIK Notes free from restrictions. "[A]wareness that someone other than the transferor has a property interest is not notice of an adverse claim." UCC 8-105 cmt.2.  Elliott purchased securities entitlements to PIK Notes on the open market, from third party marketmakers.  Complaint ¶ 36.  Even if Elliott had knowledge of the PIK PSA restrictions, in order to have notice "it must be aware that the transfer violate[d] the other party's [the Debtors'] property interest." *Id.*  Elliott is entitled to infer that its seller and predecessors (the marketmaker and prior beneficial owners) were acting in accordance with their obligations to the Debtors.  *Id.*  "The mere fact that [the purchaser, Elliott] knew that [the claimant, the Debtor] had a property interest does not mean that [Elliott] had notice of an adverse claim." *Id.*  The hypothetical fact pattern described in that UCC official comment 2 is exactly the same as the facts presented in this case.

39.     In the end, the question before the Court on the Motion is <u>whether Elliott has a substantial likelihood of success on the merits of the argument</u> that UCC 8-502 protects it from any restrictions of the PIK PSA.  The alleged restriction was in an undisclosed document (the Amended PIK PSA).  Elliott had every right to infer that predecessor holders were acting properly.  And the alleged PIK PSA restriction is not akin to a lien, and so is not an "adverse claim" on Elliott's securities entitlements to PIK Notes.  UCC 8-502 is intended to protect the integrity of public markets for negotiable securities and purchasers of securities entitlements in

18

precisely this situation.  There can be no doubt that these facts and law meet the standard of the first prong to support a preliminary injunction.

## II.     THERE IS A THREAT OF IMMINENT IRREPARABLE HARM TO ELLIOTT IN THE ABSENCE OF AN INJUNCTION

40.     Harm is irreparable, to support a preliminary injunction, if the available legal remedies (*e.g.,* money damages) would be inadequate if the plaintiff prevails on the merits.  *See Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 562 F.3d 553, 557 (3d Cir. 2009).  There is no question of the irreparable harm to Elliott.

41.     The irreparable harm stems from the simple fact that EFIH is a wasting asset and Elliott holds over two-thirds of the fulcrum security.  Complaint ¶ 55.  That is, every dollar of value lost at EFIH, on the Debtors' current path, comes largely at the direct detriment of Elliott. In the context of a tax-free transaction structured as a merger at the EFH level, EFIH is insolvent based even on the price of the NextEra transaction.  That price came after an auction opportunity on that transaction structure.  The insolvency means that EFIH already cannot pay its debts; any wrongful conduct toward Elliott cannot possibly be compensated with money damages.

42.     Indeed, the PIK PSA that the Debtors are using to threaten Elliott recognizes the fundamental truth that the situation of an insolvent, wasting asset involves irreparable harm. Section 10.13 of the PIK PSA states that "money damages would be an insufficient remedy for any breach of this Agreement by any Party, that such breach would represent irreparable harm." The Debtors cannot on one hand say that Elliott is bound to the PIK PSA and on the other hand somehow assert that there is no irreparable harm to Elliott if the Debtors are the ones acting improperly in respect of that same agreement.

43.     Every week and month of delay in this case causes material loss to the PIK Notes, including Elliott.  The monthly accrual of interest on the First and Second Lien Notes is

19

approximately $30 million.  Complaint ¶ 18.  Both have legal and financial advisers, and since the notes are oversecured, the fees of those advisers will be paid by the estates.  A refinancing could save both interest and fee expenses.

44.     Similarly, the Debtors have DIP financing in place that will have to be refinanced. It currently expires on June 30, 2017, but can be extended for 6 months, to December 30, 2017. Complaint ¶ 17.  If creditors such as Elliott must wait until the Debtors and NextEra exhaust all their efforts (for example, one year from the entry of the Confirmation Order, in February 2018), yet another financing will have to be negotiated, with more interest, financing fees, and professional costs.  Allowing Elliott to move forward now with a plan process will save very substantial interest costs and professional fees as some plan at EFIH can go effective as soon as possible.

45.     These savings add up to very material amounts that Elliott and other holders of PIK Notes.  Those amounts, once lost, will never be recovered, and thus provide the impetus for the Complaint and the request for preliminary injunction.  Interest alone is $30 million per month. Complaint ¶ 18.  For $1.5 billion in original principal amount of PIK Notes, that equals two cents on the dollar each month of recovery.  The Debtors have no money to pay such losses.  The harm is irreparable.

## III.    THE BALANCE OF HARDSHIPS FAVORS ELLIOTT BECAUSE THERE IS NO HARM TO THE DEBTORS FROM ELLIOTT SPEAKING WITH OTHER CREDITORS, PROPOSING MONEY-SAVING FINANCING TRANSACTIONS, OR COMMENCING A PLAN PROCESS

46.     In the balancing of equities, "a court should consider whether granting the requested relief will result in greater harm to the party on whom it is imposed than its denial will have on the party who seeks it."  *In re Advanced Mktg. Servs., Inc.*, 360 B.R. 421, 428 (Bankr. D. Del. 2007) (citing *Farberware, Inc. v. Mr. Coffee, Inc.*, 740 F. Supp. 291, 304 (D. Del. 1990)).

47.     Here there is not even a balance.  Elliott, the largest creditor in these cases, is seeking to talk to other parties in interest and financing sources to facilitate an exit from Chapter 11.  The Debtors are threatening Elliott with liability (and/or voiding of securities trades) when they already have a transaction approved by a confirmation order.  Elliott is not trying to change the posture and status of the current NextEra transaction.

48.     Chapter 11 cases make progress when (a) major parties in interest can and do talk, and (b) when a plan and disclosure statement are publicly filed so that all creditors can then discuss during the solicitation period.  The possibility of money-saving financing sponsored by Elliott will only enhance benefits to the estates.

49.     The proposed injunction also seeks to enjoin the Debtors from threatening and enforcing old, dated nondisclosure and other agreements.  To be clear, it could be enough to rule that Elliott is substantially likely to be free from PIK PSA restrictions and Debtor threats.  But progress in the case would be more likely if the Debtors also cannot threaten other parties.  There is very unlikely to be harm to the Debtors from this.  Prior information under NDAs would fall into two principal categories: business information about the Debtors and information about negotiations.

50.     In January 2017, this Court approved a disclosure statement, finding that such public document contained all material information necessary for creditors to evaluate the Debtors at that time.  [D.I. 10560]  As a result, there should not be private information predating the January 2 disclosure statement that is somehow material.  These Debtors file monthly operating reports with their financial information, and they are holding companies, not operating entities.  The issues to be negotiated among creditors are principally financial and capital-markets related.

21

51.     Furthermore, the combination of the Third Circuit's makewhole ruling, the settlements with First Lien Notes and Second Lien Notes that fix those allowed claims, and then the PUCT Final Order (subject to pending rehearing request) have put these cases in a fundamental different negotiation and economic posture for all creditor constituencies.  Prior negotiations, even if confidential, no longer have any bearing and should not be used to impede current negotiations and progress in these cases.

52.     To the extent the Debtors have specific concerns about specific information that has been provided to specific persons, the Debtors should raise it and the preliminary injunction can be crafted accordingly.  What should not occur is the Debtors restricting creditor discussions and actions by asserting generalized harms based on old case information and agreements in a case that is at a new crossroads.

## IV.    THE GRANTING OF THE PRELIMINARY INJUNCTION IS NOT CONTRARY TO THE PUBLIC INTEREST

53.     Entry of a preliminary injunction would serve the public interest in these Chapter 11 cases.  Public policy strongly favors the correct application of the Bankruptcy Code, especially when property rights are at stake.  *In re Revel AC, Inc.*, 802 F.3d 558, 573 (3d Cir. 2015).  Elliott proposing money-saving financings, and a plan of reorganization, is not inconsistent with the Debtors' pursuit of the NextEra transactions.  It will offer the estates a further reorganization opportunity to move forward on an exit from bankruptcy in an expeditious manner.

## V.    ONLY A NOMINAL BOND IS APPROPRIATE, AND THE DEBTORS WAIVED ANY BOND REQUIREMENT

54.     A bond is required when a preliminary injunction issues.  Bankruptcy Rule 7065 (incorporating Fed. R. Civ. P. 65(c), except for preliminary relief sought by trustees); *see, e.g., Hoxworth v. Blinder, Robinson & Co.,* 903 F.2d 186, 210 (3d Cir. 1990).  However, the amount

22

of the bond is in the discretion of the court, *e.g., Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.,* 847 F.2d 100, 103 (3d Cir.1988).  In cases where the defendant has little or no irreparable harm, or there is not potential financial loss, a nominal bond (of $10,000, for example) is appropriate.  *E.g., Neo Gen Screening, Inc. v. TeleChem Int'l, Inc.*, 69 F. App'x 550, 556–57 (3d Cir. 2003); *Am. Freedom Def. Initiative v. Se. Pennsylvania Transp. Auth.*, 92 F. Supp. 3d 314, 331 (E.D. Pa. 2015).

### A.    If a Bond Is Required, It Should be Nominal Because the Debtors Cannot Demonstrate Potential Harm from the Proposed Injunction

55.    A nominal bond is appropriate here.  Elliott is not seeking to enjoin a transaction. *Compare In re Tribune Media Co.*, 799 F.3d 272, 281-82 (3d Cir. 2015); *In re W.R. Grace & Co.*, 475 B.R. 34 (D. Del. 2002).  At the moment, even the NextEra transaction is not approved by the PUCT and cannot close.  Complaint ¶¶ 51, 108.  If transactional circumstances change, the Debtors would be free to return to this Court to request imposition of a bond if warranted, in order for the preliminary injunction to continue.  And if the PUCT grants rehearing, approves the transaction and it closes, that is a desirable outcome and nothing about the preliminary injunction would stop that from occurring.

56.    All Elliott is seeking is (a) to be able to exercise its rights as a creditor in these cases, (b) to be free of threats based on the PIK PSA, and (c) to foster discussion among creditors and other parties (and with the Debtors to the extent they want to participate), all to propose competing, money-saving financings and a reorganization plan.  This would ensure that these cases continue to progress, including the filing of a plan and disclosure statement for the comprehensive inter-creditor discussion that the Bankruptcy Code contemplates after exclusivity expires in a case, in order to facilitate an exit from Chapter 11.  The exchange of information, ideas, and proposals can only help foster resolution of these cases.  These conversations cannot,

23

in and of themselves, harm the Debtors in any way. Any alternative proposal could have practical impact only in the event this Court adopted that alternative as preferable over Debtors' proposal. While Debtors may prefer to have their exclusivity period prolonged beyond the statutory limit, the fact that Debtors may need to win the battle of ideas after the exclusivity period has expired is not a "harm" that is cognizable under the Bankruptcy Code. Thus, to the extent any bond is required, a nominal bond would be the appropriate amount.

**B.** **No Bond Is Required Because in the PIK PSA the Debtors Waived any Bonding Requirement**

57.     There may be an exception to the mandatory bond. There is no question that the Third Circuit has in an unreported opinion indicated there is "tension" between Rule 65(c) and contractual waivers of the bonding requirement. *Pharmethod, Inc. v. Caserta*, 382 Fed. App'x. 214, 222 (2010). Judge Andrews of the District Court has stated a blanket rule that such contracts are unenforceable, albeit in a case involving an individual's employment. *TP Group-CI, Inc. v. Vetenick*, 2016 WL 5864030 (D. Del. 2016). In any event, Section 10.13 of the PIK PSA does just that:

> each non-breaching Party shall be entitled to specific performance of the terms hereof and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages), including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder, in addition to any other remedy at law or equity

*Id.* (emphasis added).

58.     In a highly sophisticated commercial context, and especially in bankruptcy cases where the parties generally are already at risk of losing money by the nature of the proceedings, such agreements should be enforceable. Some courts have agreed at least in some commercial contexts. In this case, the Debtors should be held to these terms. Debtors have voluntarily included such a provision in every plan support agreement they have in these cases, and Debtors'

24

arguments against Elliott rely entirely on Debtors' assertion that the PIK PSA is binding on Elliott.  If that premise is correct, as it would have to be in order for the Debtors to prevail, then, under the logic of that very agreement, Elliott would have no obligation to post a bond even upon obtaining "injunctive or other equitable relief."  In other words, the Debtors made the decision that rights and obligations under the PIK PSA should be subject to the Court's resolution without fear, on either side, of needing to post a bond in the event of injunctive relief.  The Debtors cannot deny that term of the deal they wrote while at the same time trying to enforce other terms of that very agreement against Elliott.

## SUMMARY

59.    The Debtors have represented to the Court that they are pursuing and "starting to reengage" with their creditor constituencies and potentially other parties in interest regarding a backup proposal in the event that the Eighth Plan cannot become effective.  (Ex. D at 15:9-12).  "Starting to reengage" is not the standard under the Bankruptcy Code.  Elliott requests that the Court grant the Motion to ensure that Elliott can fully exercise its rights without threats or attempts to extract procedural limitations on discussions from the Debtors.


[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

62659981_8

## CONCLUSION

For the foregoing reasons, Elliott respectfully requests that the Court enter an order, in substantially the form attached to the Motion, and granting such other relief as the Court deems just and proper.

Wilmington, Delaware
Date: May 11, 2017

BAYARD, P.A.

*/s/ Erin R. Fay*
Scott D. Cousins (No. 3079)
Erin R. Fay (No. 5268)
Evan T. Miller (No. 5364)
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
E-mail:scousins@bayardlaw.com
        efay@bayardlaw.com
        emiller@bayardlaw.com

--and--

ROPES & GRAY LLP
Keith H. Wofford
Gregg M. Galardi
D. Ross Martin
Jonathan M. Agudelo
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: 212-596-9000
Facsimile:  212-596-9090
Keith.Wofford@ropesgray.com
Gregg.Galardi@ropesgray.com
Jonathan.Agudelo@ropesgray.com

*Counsel for Elliott Associates, L.P., Elliott International, L.P., and the Liverpool Limited Partnership*

62659981_8